

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2022**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 (V) |
| | § | |
| KERWIN BURL STEPHENS, | § | Case No. 21-40817-elm-11 |
| | § | |
| THUNDERBIRD OIL & GAS, LLC, | § | Case No. 21-41010-elm-11 |
| | § | |
| THUNDERBIRD RESOURCES, LLC, | § | Case No. 21-41011-elm-11 |
| | § | |
| Debtors. | § | Jointly Administered Under |
| | § | Case No. 21-40817-elm-11 |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court for determination in this jointly-administered bankruptcy case is the *State Court Plaintiffs' Motion to Dismiss* [Docket No. 161] (the "**Motion**") filed by Tiburon Land and Cattle, LP ("**Tiburon**") and Trek Resources, Inc. ("**Trek**" and together with Tiburon, the "**Movants**"). Claiming that Kerwin Burl Stephens ("**Stephens**"), one of the chapter 11 debtors, did not file his petition for bankruptcy relief in good faith, the Movants request the Court's entry of an order dismissing the case insofar as involving Stephens (the case as so limited to Stephens

referred to herein as the "**Bankruptcy Case**").[1]  Stephens has filed a response in opposition to the Motion (the "**Response**").[2]

The Court conducted a hearing on the Motion (along with several other matters involving the same parties) on November 15 and 16, 2021.  Having now considered the Motion, Stephens' Response, the Movants' additional pre-hearing brief,[3] the evidence introduced, and the representations and arguments of counsel, the Court will deny the Motion for the reasons set forth herein.[4]

### JURISDICTION

The Court has jurisdiction of the proceeding involving the Motion pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409.  The proceeding is core in nature within the meaning of 28 U.S.C. § 157(b)(2)(A).

### FACTUAL BACKGROUND

The Movants and Stephens are parties to litigation that was commenced prior to the filing of the Bankruptcy Case.  Because the Motion focuses heavily on such litigation, it is appropriate to start with a recap of the litigation.

---

[1] The Court has previously ordered the bankruptcy cases of Thunderbird Oil & Gas, LLC (Case No. 21-41010) and Thunderbird Resources, LLC (Case No. 21-41011) to be jointly administered with the bankruptcy case of Stephens (Case No. 21-40817) under Case No 21-40817 (the case number assigned to Stephens' case).  The Motion only seeks relief in relation to Stephens' case (which is referred to as the "Bankruptcy Case" herein).

[2] Docket No. 185.

[3] Docket No. 251.

[4] On January 25, 2022, Stephens filed a *Supplemental Brief* [Docket No. 282] in response to which the Movants filed a *Reply* [Docket No. 286] on February 4, 2022.  Because, in each case, leave to file the Supplemental Brief and Reply was neither requested nor granted, the Court has not considered and will not consider the Supplemental Brief and Reply.

### A.      The Fisher County Oil and Gas Opportunity[5]

The events leading up to the dispute between the parties go back to 2011 when Richard Raughton ("**Raughton**") became aware of a growing interest in oil and gas properties in Fisher County, Texas.  Raughton, the holder of a degree in geology with a concentration in engineering, had previously conducted geological studies of a shale formation in Fisher County, and the indications of interest corresponded to the geological studies.  Raughton sought to leverage the information that he had obtained from the studies in a way that he could profit from the developing Fisher County oil and gas play.  Lacking sufficient capital of his own to fully capitalize on the opportunity, however, he reached out to friends and business contacts to invite them to participate in the project.

Among the individuals contacted by Raughton was Stephens, a practicing attorney who had previously performed various legal services for Raughton and certain of his entities, and who had also previously participated with Raughton in a few oil and gas investments involving the Barnett Shale.  Ultimately, Raughton, Stephens, and two others, Chester Carroll ("**Carroll**") and Lowry Hunt ("**Hunt**"), would agree to participate in a venture to acquire Fisher County oil and gas leases and options for such leases with an eye towards thereafter flipping them to interested buyers for a profit.  Each of these individuals pledged to invest $125,000 to get the project off the ground.

By October 2011, additional capital was needed to move the project forward.  At that point, Carroll successfully recruited Tom Taylor ("**Taylor**"), another regular oil and gas investor, to join the effort.  Thereafter, in an October 7, 2011 letter agreement that would come to be known as the

---

[5] Unless otherwise indicated, the background facts set out in parts A and B of the Factual Background come from *Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687, 697-700 (Tex. App. – Eastland 2019, pet. denied) (admitted into evidence as Plaintiffs' Exh. 7 and Debtors' Exh. 4).

"Alpine Letter Agreement," Raughton, Stephens, Carroll, Hunt and Taylor collectively mapped out how the project would proceed. Among other things, they identified the entities through which each of the individuals would participate: Raughton through Arapaho Energy, LLC ("**Arapaho**"); Stephens through Thunderbird Oil & Gas, LLC ("**Thunderbird Oil**"); Carroll through Alpine Petroleum ("**Alpine**") (a d/b/a name used by Carroll); Hunt through L.W. Hunt Resources, LLC ("**Hunt Resources**"); and Taylor through Paradigm Petroleum Corporation ("**Paradigm**"). While not a party to the agreement, Thunderbird Land Services, LLC ("**Thunderbird Land**"), another Stephens company, was to provide landman services for the project at its customary rate for such services.

Under the terms of the Alpine Letter Agreement, Arapaho, Thunderbird Oil, Alpine (Carroll) and Hunt Resources (collectively, the "**Alpine Group**") were to collectively contribute $500,000 and all of the oil and gas leases and options that they held at the time as described in exhibits to the agreement, and Paradigm was to contribute $4,500,000. Going forward, the existing oil and gas leases and options and all leases and options thereafter acquired would be held in Paradigm's name, Paradigm was to have control over the approval of future acquisitions and sales, and Paradigm was to have control over the scope of the project. The Alpine Letter Agreement also detailed how the proceeds from sales were to be divided among the parties.

With respect to Paradigm's investment obligation, Taylor, in turn, recruited an additional set of investors to participate in what he referred to as the "Three Finger/Black Shale Prospect" in Fisher County, Texas, describing it as a project involving 25,000 net mineral acres. Paradigm and the additional investors/investor-related parties entered into a separate "Participation Agreement," effective October 18, 2011. Tiburon and Trek were among the parties to the Participation

Agreement. Pursuant to the Participation Agreement, Paradigm was to contribute $1,000,000 and each of the other parties to the agreement was to contribute $500,000 each.

Pursuant to later amendments and an addendum to the Participation Agreement, Lazy T Royalty Management, LP ("**Lazy T Management**") was substituted for Paradigm, with Paradigm's status changed to "agent for the Parties," and the Alpine Group was added as a party. Tiburon and Trek would later assert that the Participation Agreement created a partnership referred to as the Three Finger Black Shale Group partnership ("**Three Finger**").

### B.    *The Devon Transactions*

The venture proved to be extremely successful. In January 2012, Devon Energy Production Company, L.P. ("**Devon**") entered into a purchase and sale agreement with Paradigm pursuant to which Devon agreed to purchase 25,000 net mineral acres of oil and gas leases for $900 per acre (the "**Devon Agreement**"). Additionally, Devon was granted an option to purchase any additional Fisher County oil and gas acreage that Paradigm and its associates might thereafter acquire subject to Devon's corresponding agreement to not acquire any oil and gas leases from Fisher County mineral owners directly. Ultimately, the Devon Agreement was amended to increase the acreage to 30,000 net mineral acres for $25 million (subject to adjustments).

The Devon Agreement was to be effective as of January 27, 2012. Just before the Devon deal closed, Stephens approached the rest of the Alpine Group to request a modification to their inter-group agreement. Claiming that the sharing of profits among the group was unfair to him, he successfully negotiated a modification to such terms to increase his share of the Alpine Group profits. Thereafter, the Devon transaction closed.

Prior to the closing, certain of the parties had failed to satisfy their funding obligations under the Alpine Letter Agreement or Participation Agreement, as applicable. Additionally, in

finalizing the transaction, Devon personnel informed Taylor that Devon was interested in acquiring even more acreage. Taylor informed Stephens (among others) of such interest, but also told Stephens that while, individually, he was interested in continuing the project, the other parties to the Participation Agreement were not. As a result, along with a June 29, 2012, update to the Participation Agreement parties, Taylor included a proposed Termination of Participation Agreement for each of the parties to execute, effective June 1, 2012, whereby each of the parties would acknowledge completion of the project contemplated by the Participation Agreement and mutually release one another. While it appears that most of the parties executed the agreement, Tiburon and Trek refused.

Thereafter, Taylor, Carroll and Stephens moved forward with the acquisition of additional Fisher County oil and gas leases to the exclusion of other Participation Agreement parties, including, to some extent, Raughton and Hunt Resources, and ultimately sold an additional 43,602.79 net mineral acres to Devon.

**C.      *Initiation of the Original State Court Action and Prepetition Proceedings Involving the Litigation***

At some point, the additional sales were discovered. When the profits were not shared, Tiburon initiated litigation in the 32nd Judicial District Court of Fisher County, Texas (the "**State Trial Court**"), under Cause No. DC-2013-0016 (the "**Original State Court Action**"), against Taylor, Paradigm, Lazy T Management, Lazy T. Royalty, LLC (another Taylor affiliate, and together with Lazy T Management, the "**Lazy T Entities**"), and the Alpine Group. Thereafter Trek was added as a plaintiff and Tiburon and Trek added Carroll, Stephens, Thunderbird Oil and Thunderbird Resources, LLC ("**Thunderbird Resources**") as additional defendants. Then Raughton and Hunt Resources (collectively, the "**Intervenors**") intervened as plaintiff-side parties and over time added as defendants, among others, Alpine (Carroll), Thunderbird Land, Stephens

& Myers, LLP ("**SMLLP**") (Stephens' law firm), and the independent executrix of Taylor's estate (after the death of Taylor) (the "**Taylor Estate**"). Finally, Tiburon and Trek also added Three Finger as a plaintiff party (together with the Tiburon and Trek, the "**Plaintiff Parties**").[6]

On or about March 4, 2015, the Plaintiff Parties filed their Seventh Amended Petition pursuant to which they asserted claims against the defendants for, among other things, breach of contract, breach of fiduciary duty, fraud and conspiracy.[7] Separately, the Intervenors asserted claims against various of the defendants for, among other things, breach of contract, breach of fiduciary duty, and fraud.[8] The case was set for trial in late July 2015. Just prior to trial, however, on or about July 25, 2015, the Plaintiff Parties, the Intervenors, Arapahoe, the Taylor Estate, Paradigm, the Lazy T Entities, and certain other parties entered into a Compromise Settlement Agreement with Mutual Releases and Covenant Not to Sue, effective July 27, 2015, pursuant to which the Taylor Estate and Taylor-affiliated defendants settled with the Plaintiff Parties and Intervenors.[9]

Thereafter, beginning on July 28, 2015, the remaining, unsettled claims were tried to a jury. At the conclusion of a three-week trial, the jury was given a 69-page jury charge with 54 questions.[10] The jury returned a verdict (the "**Jury Verdict**") largely in favor of the Plaintiff Parties and Intervenors.[11] Importantly, in connection with post-verdict motion practice,[12] the Plaintiff Parties opted to request judgment on the Three Finger claims instead of on the individual

[6] *See Stephens*, 580 S.W.3d at 700-01.

[7] *See* Plaintiffs' Exh. 50.

[8] *See Stephens*, 580 S.W.3d at 700-01.

[9] *See* Debtors' Exh. 52.

[10] *See Stephens*, 580 S.W.3d at 702.

[11] *See* Plaintiffs' Exh. 5 (Jury Verdict).

[12] *See, e.g.*, Plaintiffs' Exhs. 19-25.

Tiburon and Trek claims. As a result, on March 30, 2016, the State Trial Court entered a Final Judgment in favor of Three Finger and the Intervenors (the "**State Court Judgment**"). Pursuant to the State Court Judgment, the State Trial Court awarded (in addition to relief against other defendants) in excess of $18.4 million in compensatory and punitive damages to Three Finger against Stephens, in excess of $1.7 million in compensatory damages to Raughton against Stephens, and roughly $2.85 million in compensatory damages to Hunt Resources against Stephens, in each case exclusive of prejudgment interest and costs.[13]

Appeals from the State Court Judgment were timely lodged by Stephens and defendants affiliated with him and by the Intervenors. To obtain a stay pending appeal, Stephens was forced to pledge non-exempt real estate in which he held an interest (collectively, the "**Investment Real Estate**") to BancCentral, National Association ("**BancCentral**"), Stephens' lender, in order to obtain BancCentral's issuance of a letter of credit in favor of U.S. Specialty Insurance Company ("**US Specialty**"), a surety bonding company, so that US Specialty would, in turn, issue the required roughly $6.2 million supersedeas bond in favor of Three Finger and the Intervenors (the "**Supersedeas Bond**").[14]

On June 28, 2019, the Eleventh Court of Appeals at Eastland, Texas (the "**Texas Appellate Court**") issued its ruling (the "**Appellate Ruling**").[15] In relation to the judgment awarded to Three Finger against Stephens, the Texas Appellate Court reversed and rendered judgment that Three

---

[13] *See* Plaintiffs' Exh. 6 (State Court Judgment).

[14] *See* Debtors' Exhs. 2, 33A-33F. Initially, Stephens requested the State Trial Court's approval of alternative security in the place of a supersedeas bond. *See, e.g.*, Debtors' Exhs. 13-15. After such requests were denied, the State Court Judgment was abstracted. Thereafter, Stephens sought entry of an order requiring a release of the abstracts so that the Investment Real Estate could be pledged to BancCentral to obtain the Supersedeas Bond from US Specialty. *See* Debtors' Exh. 16. When the request was denied, Stephens was forced to request review of the ruling by the Texas court of appeals, and after obtaining a favorable ruling from the appellate court, successfully obtained a release of the abstracts in order to obtain the Supersedeas Bond. *See* Debtors' Exhs. 5 and 18.

[15] *See Stephens*, 580 S.W.3d at 696.

Finger take nothing. However, the court also remanded the case to the State Trial Court to permit Tiburon and Trek to pursue recovery, individually, based upon the jury's findings in favor of them. In relation to the judgment awarded to the Intervenors, the Texas Appellate Court reversed the State Court Judgment in part, and affirmed in part, ultimately upholding the damages awarded to the Intervenors against Stephens.[16]

In response to the Appellate Ruling, petitions for review by the Texas Supreme Court were filed by multiple parties, including Three Finger and Stephens. On August 28, 2020, the Texas Supreme Court denied the petitions and on March 5, 2021, denied the parties' respective motions for rehearing.[17] Consequently, on March 10, 2021, the Texas Appellate Court issued its mandate, remanding the case to the State Trial Court for further proceedings.[18]

The next day, on March 11, 2021, the Movants filed a motion for entry of judgment in their favor based upon the Jury Verdict (the "**Motion for Judgment**").[19] Stephens (and the defendants affiliated with him) filed a response in opposition to the Motion for Judgment and a motion for judgment *non obstante verdicto*. (the "**JNOV Motion**").[20] Prior to determination of the Motion for Judgment and JNOV Motion, the Movants successfully petitioned the State Trial Court for pre-judgment injunctive relief against Stephens. The injunction orders issued (collectively, the "**Prejudgment Injunction**") precluded Stephens from, among other things, transferring, disposing of, or otherwise using *any* of his assets through at least April 26, 2021.[21]

---

[16] *See id.* at 732.

[17] *See* Debtors' Exh. 20.

[18] *See* Debtors' Exh. 23.

[19] *See* Plaintiffs' Exh. 8.

[20] *See* Plaintiffs' Exhs. 9 and 10.

[21] *See* Debtors' Exhs. 59 and 60.

Separately, the Intervenors filed a motion to request severance of their claims from the Movants' claims and for entry of an order providing for payment of the portion of the State Court Judgment in their favor against Stephens from the Supersedeas Bond. On March 31, 2021, the State Trial Court granted the Intervenors' request for severance, opening a new Cause No. DC-2013-0016A (the "**Severed State Court Action**") into which all of the claims of the Intervenors (with one exception)[22] were moved, but instead of granting the Intervenors' request for payment from the Supersedeas Bond, entered an order requiring the full amount of the Supersedeas Bond to be paid into the state court registry.[23] On April 6, 2021, Stephens (and the defendants affiliated with him) filed objections to the March 31 orders and a request for reconsideration.[24]

## D.  *Stephens' Bankruptcy Filing*

In the face of the Prejudgment Injunction that precluded Stephens from using or disposing of *any* of his own property for *any purpose whatsoever*, the likely impending entry of judgment in favor of the Movants against Stephens, Stephens' inability to stay such judgment on appeal, and the potential foreclosure of Investment Real Estate to satisfy amounts that would be owed to BancCentral upon US Specialty's payment on the Supersedeas Bond and draw on the letter of credit, Stephens filed a voluntary petition for relief under chapter 11 (subchapter V) of the Bankruptcy Code on April 7, 2021 (the "**Petition Date**"), thereby initiating the Bankruptcy Case.

In connection with the bankruptcy filing, Stephens filed his schedules of assets and liabilities (the "**Schedules**") listing assets having an aggregate estimated fair market value of approximately $11,448,002.26 and liquidated liabilities in the aggregate amount of approximately

---

[22] On March 30, 2021, Thunderbird Land filed for bankruptcy protection in the Northern District of Texas (Case No. 21-10042 in the Abilene Division). Therefore, the Intervenors' claims against Thunderbird Land were not moved to the Severed State Court Action.

[23] *See* Debtors' Exhs. 21 and 22 (exhibit B thereto).

[24] *See* Debtors' Exh. 22.

$7,736,684.59, in each case as of the Petition Date.[25] With respect to the liability listings, however, Stephens reflected the amounts owed to the Intervenors as "unknown," apparently in light of the fact that the final amount of the judgment in favor of the Intervenors had not yet been determined, he reflected the amount owed to the Movants as "$0" and disputed, and he included no listing at all with respect to his estranged wife, Gail Stephens, who was and is pursuing a divorce from Stephens. The claims of such parties have since either been fully and finally liquidated and allowed (Intervenors) or asserted in liquidated amounts pursuant to proofs of claim filed in the case. First, in the case of the case of the Intervenors, pursuant to a settlement reached between Stephens and the Intervenors (discussed further below), the Intervenors' judgment has been fully liquidated and approved in the aggregate amount of $5.9 million.[26] Second, in the case of the Movants, each of the them has filed a proof of claim to assert a claim against Stephens in the amount of $4,747,839.[27] And, finally, in the case of Gail Stephens, Ms. Stephens has filed a proof of claim to assert a claim against Stephens in the amount of $7,217,927.76.[28] While Stephens disputes the claims asserted by the Movants and Ms. Stephens, the addition of such claims to the agreed upon amount of the Intervenors' judgment and the aggregate amount of all other liquidated liabilities scheduled by Stephens increases the aggregate estimated amount of Stephens' liabilities to approximately $30,350,290 as of the Petition Date.

---

[25] *See* Debtors' Exh. 65.

[26] *See* Debtors' Exh. 32.

[27] *See* Debtors' Exhs. 61 and 62.

[28] *See* Debtors' Exh. 71.

**E.      The Movants' Filing of Bankruptcy Claims and Stephens' Removal of
Claims and Causes of Action in the Original State Court Action**

As indicated above, each of the Movants has asserted a claim in the Bankruptcy Case.  On

June 16, 2021, Tiburon filed a proof of claim against Stephens (assigned Claim No. 10) to assert

a claim against the Stephens bankruptcy estate in the amount of $4,747,839 and Trek filed a proof

of claim against Stephens (assigned Claim No. 11) to assert a claim against the Stephens

bankruptcy estate in the amount of $4,747,839, in each case based upon the Jury Verdict and the

Movants' claims against Stephens in the Original State Court Action.[29]   Tiburon's and Trek's

claims against the Stephens bankruptcy estate are collectively referred to herein as the "**Movants'**

**Bankruptcy Claims**."

Shortly after the Movants filed the Movants' Bankruptcy Claims, Stephens (and the

affiliated Thunderbird debtors) removed all remaining claims and causes of action in the Original

State Court Action (collectively, the "**Removed Claims**") to this Court pursuant to 28 U.S.C. §

1452, thereby initiating Adversary Proceeding No. 21-04040.[30]   Then, on July 27, 2021, Stephens

filed objections to each of the Movants' Bankruptcy Claims in the Bankruptcy Case.[31]   As of the

date hereof, both the adversary proceeding and the claims objections remain pending.

**F.      Postpetition Actions Taken by Stephens to Satisfy Claims
and Reorganize His Debts and Business Affairs**

On April 8, 2021, the day after the Petition Date, Stephens removed the Intervenors' claims

and causes of action from the Severed State Court Action to this Court, thereby initiating

Adversary Proceeding No. 21-04021.  Shortly thereafter, Stephens filed motions in the adversary

proceeding with the objective of fully and finally liquidating the amount of the Intervenors'

---

[29] *See* Debtors' Exhs. 61 and 62.

[30] *See* Docket No. 1 in Adversary Proceeding No. 21-04040.

[31] *See* Debtors' Exhs. 79 and 80.

judgment and providing for satisfaction of the judgment out of proceeds of the Supersedeas Bond.[32]  Following Stephens' obtaining of approval for US Specialty to pay the full amount of the Supersedeas Bond into the registry of this Court,[33] Stephens and the Intervenors reached agreement on the final amount of the Intervenors' judgment, which was approved by the Court, and Stephens obtained court approval to satisfy the Intervenors' judgment from proceeds of the Supersedeas Bond.[34]

Upon US Specialty's payment on the Supersedeas Bond, it obtained reimbursement of such amount from the letter of credit issued by BancCentral, thereby triggering Stephens' obligation to, in turn, reimburse BancCentral.[35]  Inasmuch as the BancCentral indebtedness is secured by the Investment Real Estate and Stephens does not have any other assets of sufficient value to satisfy the BancCentral indebtedness, Stephens has been actively marketing the Investment Real Estate and has obtained court approval for the sale of several parcels of land with the net proceeds applied toward the outstanding balance of the BancCentral debt.[36]

Separately, Stephens has also filed a proposed plan of reorganization in the Bankruptcy Case (the "**Plan**").[37]  Pursuant to the Plan, Stephens proposes to fully satisfy all allowed general unsecured claims from sales proceeds from the sale of Investment Real Estate or, to the extent

---

[32] *See, e.g.,* Debtors' Exhs. 26-27.

[33] *See* Debtors' Exh. 28.

[34] *See* Debtors' Exhs. 30 and 32.

[35] *See* Debtors' Exhs. 33A-33F; *see also* Debtors' Exh. 67 (claims register reflecting BancCentral's filing of proof of claim to assert a secured claim in the amount of $6,281,359.98).

[36] *See* Debtors' Exh. 49 (summary of land sales); *see also* Debtors' Exhs. 35, 37-42, and 45-48 (underling motions and orders with respect to the land sales).

[37] *See* Debtors' Exh. 73.

necessary, from the sale of Stephens' interests in, or the assets of, certain of Stephens' business entities and/or from disposable income.[38]

### DISCUSSION

Pursuant to the Motion, the Movants seek dismissal of the Bankruptcy Case pursuant to section 1112(b)(1) of the Bankruptcy Code. In relevant part, section 1112(b)(1) provides that, on request of a party in interest and after notice and a hearing, "the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors and the estate, for cause." [39] Here, the Movants assert that "cause" for dismissal exists because Stephens allegedly did not file his petition for bankruptcy relief in good faith.

"Cause" is not defined in section 1112. While a non-exclusive listing of circumstances constituting "cause" for purposes of section 1112 is set out in section 1112(b)(4),[40] a debtor's lack of good faith in filing for bankruptcy protection is not among such listed circumstances. Notwithstanding same, because bankruptcy is an equitable remedy, "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."[41] Accordingly, a

---

[38] *See id*. (§ 5.3(a) – proposed treatment of General Unsecured Claims).

[39] 11 U.S.C. § 1112(b)(1). Of note, while section 1112(b)(1) provides an exception to conversion or dismissal where the court determines that the appointment of a trustee or examiner under section 1104(a) would, instead, be in the best interests of creditors and the estate, section 1104 of not applicable in a subchapter V chapter 11 case. *See* 11 U.S.C. § 1181(a).

[40] *See* 11 U.S.C. § 1112(b)(4).

[41] *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir. 1986).

debtor's lack of good faith in pursuing bankruptcy relief has long been recognized as cause for dismissal of the case.[42]

The determination of whether a bankruptcy case has been commenced in good faith is to be made based upon a consideration of the totality of the circumstances.[43] It "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."[44] Where the debtor's good faith in filing is called into question, while the movant for dismissal has the initial burden of making out a prima facie case of lack of good faith on the part of the debtor, once that initial burden is satisfied the burden shifts to the debtor to prove by a preponderance of the evidence that the case was filed in good faith.[45]

In the chapter 11 context, for a filing to be considered in good faith, the primary purpose of the filing must be to reorganize or to respond to financial crisis.[46] The Movants assert that Stephens' bankruptcy filing was motivated by neither of these objectives, instead having been driven by the desire to avoid the entry of judgment by the State Trial Court and to attempt to obtain a second bite of the apple in this Court. Stephens disputes such contentions, asserting that he filed the Bankruptcy Case for the purpose of both responding to a financial crisis and reorganizing his debts and business affairs.

---

[42] *See Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 816-17 (5th Cir. 1991); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3rd Cir. 1999); *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 764 (1st Cir. 1983); *In re National Rifle Ass'n of Am.*, 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021).

[43] *Investors Group, LLC v. Pottorff*, 518 B.R. 380, 382 (N.D. Tex. 2014); *see also In re Nassar*, 216 B.R. 606, 608 (Bankr. S.D. Tex. 1998).

[44] *Little Creek Dev. Co.*, 779 F.2d at 1072.

[45] *National Rifle Ass'n of Am.*, 628 B.R. at 270; *see also In re Fox*, 232 B.R. 229, 233 (Bankr. D. Kan.), *appeal dism'd*, 241 B.R. 224 (B.A.P. 10th Cir. 1999).

[46] *See Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*, 431 Fed. Appx. 272, 275 (5th Cir. 2011).

### A. *Filing to Obtain Relief from Financial Crisis*

First, the Movants assert that Stephens' bankruptcy filing was not motivated by any sort of financial crisis. In this regard, while Movants concede that insolvency is not a requirement for bankruptcy relief,[47] they highlight the fact that, here, Stephens' own bankruptcy Schedules reflect assets of a value that greatly exceeds the amount of his liabilities. As such, there can only be one reason why Stephens rushed to bankruptcy, according to the Movants – to avoid the State Trial Court's entry of judgment coupled with an intent to forum shop for a more favorable outcome. While Stephens acknowledges that the Bankruptcy Case "arises out of" the Original State Court Action,[48] he disputes the assertion that the purpose of the filing was to attempt to forum shop the litigation elsewhere. Instead, he emphasizes that the primary purpose of the filing was to respond to the imminent financial disaster brought about by the litigation.

Starting with Stephens' financial position as of the Petition Date, while Stephens hopes that his liabilities ultimately turn out to be less than the fair market value of all of his assets, such an outcome is certainly less than clear. In this regard, while at first blush the Schedules do reflect a net worth in excess of $3.7 million, the Schedules do not include liquidated claim amounts for the Intervenors, the Movants, and Ms. Stephens. Now that each of those claims have either been resolved (Intervenors) or evidenced by proofs of claim filed in the Bankruptcy Case (Movants and Ms. Stephens), the liquidated amount of claims existing or asserted against Stephens as of the Petition Date have increased by roughly $22.6 million, resulting in liquidated liabilities exceeding the scheduled fair market of Stephens' assets by nearly $19 million, thus calling into question Stephens' solvency as of the Petition Date. Additionally, Stephens scheduled the Investment Real

---

[47] *See, e.g., In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992); *In re Johns-Manville Corp.*, 36 B.R. 727, 732 (Bankr. S.D.N.Y. 1984).

[48] *See* Response, ¶ 2.

Estate at levels that he believed to represent fair market values that could be realized if reasonably marketed and sold under non-distressed conditions. Prior to the bankruptcy filing, however, the Movants successfully obtained entry of the Prejudgment Injunction that precluded Stephens from undertaking any sort of rational marketing and sales process, thereby exposing the Investment Real Estate to foreclosure risk by BancCentral upon US Specialty's draw on the letter of credit.

More importantly, however, Stephens convincingly testified that, already facing the reality of having no ability to supersede any judgment that the Movants may obtain against him pending appeal,[49] the tipping point for him in deciding to file for bankruptcy protection was the State Trial Court's issuance of the Prejudgment Injunction that not only prevented him from pursuing the orderly sale of the Investment Real Estate, as indicated above, but more seriously prohibited him from even being able to pay for his normal day-to-day living expenses. And while the Movants have sought to distance themselves from the expansiveness of the Prejudgment Injunction by claiming that Stephens could have simply requested a modification to the injunction, such argument rings hollow. In requesting the injunctive relief, the Movants themselves suggested a carve-out for expenses incurred in the ordinary course of business.[50] Yet, the State Trial Court excluded the Movants' proposed ordinary course carve-out language in issuing the more restrictive

---

[49] Picking up on Stephens' recognition that he had no ability to supersede any judgment that might be awarded to the Movants by the State Trial Court, the Movants argue that Stephens' bankruptcy filing as an alleged substitute for the positing of a bond to stay execution of the judgment pending appeal is also evidence of lack of good faith. While the Court finds that Stephens' decision to file for bankruptcy protection was ultimately motivated by considerations other than the inability to supersede any judgment that might have been issued, like the Bankruptcy Court for the District of Kansas, this Court "declines to adopt a *per se* rule that filing a bankruptcy as a substitute for posting an appeal bond always constitutes bad faith." *Fox*, 232 B.R. at 234. The Court must consider the *totality* of the circumstances that existed at the time of the filing to evaluate the motivations and objectives of the debtor in seeking bankruptcy relief.

[50] *See* Debtor's Exh. 58, ¶¶ 27 and 28 and prayer for relief (requesting injunctive language precluding the sale, transfer, dissipation, or other disposition of property "other than in the ordinary course of business").

Prejudgment Injunction.[51]  Thus, for this and other reasons[52] it was not unreasonable for Stephens to have concluded that any such request was highly unlikely to succeed.  Moreover, a prospective debtor is not required to exhaust all avenues of recourse in relation to pending litigation before seeking the breathing spell refuge of bankruptcy relief.

In short, based upon the Court's consideration of a totality of the circumstances, the Court finds that Stephens has successfully established that one of the primary purposes of the bankruptcy filing was to address the financial crisis brought about by the State Trial Court's issuance of the Prejudgment Injunction.  Not only did the Prejudgment Injunction prevent Stephens from being able to pay for day-to-day living expenses, it also impacted Stephens' ultimate solvency by precluding Stephens from taking steps to market the Investment Real Estate for sale at fair market values instead of being foreclosed upon by BancCentral.

**B.      *Filing to Reorganize Debts and Financial Affairs***

Second, the Movants assert that Stephens' bankruptcy filing was not made for any reorganizational purpose.  Characterizing the Bankruptcy Case as nothing more than a two-party dispute between Stephens and the Movants that can be resolved in the State Trial Court, the Movants argue that the only reason Stephens filed the case was to try to get a second bite at the apple with respect to prejudgment relief that was previously rejected by the State Trial Court.

---

[51] *See* Debtors' Exhs. 59 and 60 (adopting the Movants' requested injunction language *without* the "other than in the ordinary course of business" carve-out).

[52]  The parties spent considerable time at the hearing attempting to persuade the Court of the permissibility/impermissibility and/or appropriateness/inappropriateness, as applicable, of various *ex parte* communications that took place between the presiding judge of the State Trial Court and one of the attorneys for the Intervenors during the pendency of the state court proceedings.  *See generally* Debtors' Exh. 82 (exhibits 1-8 thereto). While the Court declines to make any determination with respect to the propriety of such communications inasmuch as that is a matter more appropriately left to the state judicial system to address, the Court does find that the existence of the communications presents a reasonable basis for Stephens to have questioned whether he would have had any success in petitioning the State Trial Court for any relief from the Prejudgment Injunction.

To frame the issue, it is generally recognized that "a Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose."[53] Thus, where a case, for all practical purposes, only involves, for example, one major creditor, few (if any) other creditors holding relatively small claims, one major asset, no employees other than the principal or principals, little or no cash flow, and no source of income to sustain a plan of reorganization, such circumstances evidence a lack of any valid reorganizational purpose, thus warranting dismissal.[54] Similarly, where the primary purpose in filing is to gain an unfair advantage in pending litigation, courts have found cause for dismissal to exist for lack of good faith.[55] With the foregoing in mind, Stephens takes issue with both the characterization of the Bankruptcy Case as nothing more than a two-party dispute and with the suggestion that the case was filed for the primary purpose of obtaining an unfair advantage in litigation.

First, Stephens correctly notes that the Bankruptcy Case is more than a simple two-party dispute. It has involved a number of creditors other than the Movants holding substantial claims against the estate. In the case of the Intervenors, for example, once the Bankruptcy Case was filed Stephens immediately began to take action to obtain a final determination of the amount of the Intervenors' judgment and to satisfy such judgment. In this regard, he promptly removed the Intervenors' claims and causes of action from the Severed State Court Action to facilitate having the proceeds of the Supersedeas Bond paid into the registry of this Court for the ultimate purpose of paying the Intervenors' judgment. And then following the removal, he obtained approval for

---

[53] *SGL Carbon Corp.*, 200 F.3d at 165.

[54] *See, e.g., Little Creek Dev. Co.*, 779 F.2d at 1073 ("Resort to the protection of the bankruptcy laws is not proper [where] there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'").

[55] *Pottorff*, 518 B.R. at 384; *Antelope Techs., Inc.*, 431 Fed. Appx. at 275; *In re Trust*, 526 B.R. 668, 679-80 (Bankr. N.D. Tex. 2015).

US Specialty to pay the bond proceeds into the Court's registry and filed motions to liquidate the amount of the Intervenors' judgment and to pay the judgment from the bond proceeds, eventually resulting in a negotiated settlement that was approved by the Court that finalized the amount of the judgment and provided for the judgment's satisfaction from bond proceeds. Next, in the case of BancCentral, immediately upon the bankruptcy filing Stephens took steps to actively market and pursue the sale of various parcels of the Investment Real Estate to begin paying down the BancCentral debt secured by the property. Indeed, since the Petition Date Stephens has successfully obtained court approval for the sale of at least four different tracts of the Investment Real Estate for roughly $4.75 million in the aggregate, and he has obtained court approval for the net proceeds of such sales to be applied in partial satisfaction of BancCentral's secured claim in the Bankruptcy Case. Finally, in addition to the Movants' Bankruptcy Claims and the outstanding balance of the BancCentral claim, substantial claims have been asserted in the Bankruptcy Case by, among other creditors, Ms. Stephens (appx. $7.2 million), First Financial Bank (appx. $36,000), JPMorgan Chase Bank (appx. $42,000), Kelly Hart & Hallman LLP (appx. $568,000), and Drennan Langdon & Fidel, LLP (appx. $120,000).[56] In relation to all of these claims, including the Movants' claims, Stephens has filed a proposed reorganization Plan that sets out the means by which each such claim will be satisfied to the extent allowed. Such actions are indicative of a filing made for reorganizational purposes.

Second, in response to the Movants' assertion that the bankruptcy filing is nothing more than an attempt to get a second bite at the apple, Stephens correctly notes that the jury trial on the Movants' claims has already taken place, the Jury Verdict has already been rendered, and the Texas Appellate Court had remanded the Original State Court Action to the State Trial Court for the sole

---

[56] *See* Debtors' Exhs. 68-72.

purpose of giving the Movants the opportunity to request the entry of judgment on their individual claims based upon the Jury Verdict. As acknowledged by Stephens, "[t]here will be no do-overs or relitigation."[57] That said, the Movants question the purpose of Stephens' removal of the Removed Claims from the Original State Court Action to this Court, highlighting the fact that Stephens' response in opposition to the pending Motion for Judgment and Stephens' pending JNOV Motion are effectively identical to the response in opposition to the Plaintiff Parties' earlier motion for entry of judgment and Stephens' earlier JNOV motion that the State Trial Court either expressly or implicitly rejected in entering the original State Court Judgment.[58] While such actions, in isolation, do raise concerns with respect to Stephens' motivation, in context the actions are explainable and not indicative of bad faith.

First, while the post-petition removal of claims and causes of action in mature litigation always raises concerns of forum shopping, here the Court notes that the removal was taken only after the Movants had asserted the Movants' Bankruptcy Claims in the Bankruptcy Case (which incorporate by reference the Removed Claims) thereby subjecting the Removed Claims to the claims allowance/disallowance process in bankruptcy. And while Movants nevertheless argue that the determination of such claims should be left to the State Trial Court based upon the State Trial Court's familiarity with the case, Jeff Levinger, an experienced Texas appellate lawyer who participated in the jury charge conference as part of the Plaintiff Parties' legal team, methodically walked the Court through how the State Trial Court would go about reviewing the Jury Verdict in determining the Removed Claims – an exercise that can just as easily be undertaken by this Court.

---

[57] Response, ¶ 29.

[58] *Compare, e.g.*, Plaintiffs' Exh. 9 (Stephens and affiliated parties' *post-remand* response to Motion for Judgment) and Plaintiffs' Exh. 10 (Stephens and affiliated *parties' post-remand* JNOV Motion) *with* Plaintiffs' Exh. 20 (Stephens and affiliated parties' *prejudgment* response to motion for judgment) and Plaintiffs' Exh. 19 (Stephens and affiliated parties' prejudgment JNOV motion).

Turning to the suggestion that, in an effort to pursue a second bite at the apple, Stephens filed duplicative pleadings to assert arguments previously rejected by the State Trial Court, the Court notes that such pleadings were filed with the *State Trial Court* prior to the filing of the Bankruptcy Case and prior to the removal of the Removed Claims to this Court; they were not filed with this Court post-removal. Thus, it can hardly be said that the existence of such filings is indicative of an effort to forum shop for a different result in this Court. Instead, if anything, it appears that Stephens filed the pleadings in the Original State Court Action with the view, correct or not, that he has a valid basis upon which to re-urge the challenges in relation to any determination of whether, judgment should be entered in favor of the Movants on the Movants' individuals claims and causes of action (instead of the claims and causes of action of Three Finger).

In short, based upon the Court's consideration of the totality of the circumstances, the Court finds that Stephens has successfully established a valid reorganizational purpose to the bankruptcy filing. He has sought to address outstanding claims against him on a rational basis that enables the maximation of value for the benefit all creditors, including the Movants.

## CONCLUSION

Thus, finding that Stephens has successfully carried his burden of proving that he filed the Bankruptcy Case in good faith, the Court will deny the Motion.

## ORDER

Accordingly, for all of the foregoing reasons, it is hereby:

**ORDERED** that the Motion be and is DENIED.

### # # # END OF MEMORANDUM OPINION AND ORDER # # #